Evan J. Smith
Marc L. Ackerman
BRODSKY & SMITH
Two Bala Plaza
Suite 805
Bala Cynwyd, PA 19004
Telephone:    610-667-6200
Facsimile:     610-667-9029
esmith@brodskysmith.com
mackerman@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT WILSON,<br><br>                           Plaintiff,<br><br>                  vs.<br><br>ZYNERBA PHARMACEUTICALS, INC.,<br>ARMANDO ANIDO, WARREN D.<br>COOPER, JOHN P. BUTLER, WILLIAM<br>J. FEDERICI, DANIEL L. KISNER,<br>KENNETH I. MOCH, and PAMELA<br>STEPHENSON,<br><br>                           Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1)  Violation of § 14 (e) of the Securities<br>        Exchange Act of 1934<br>(2)  Violation of § 14 (d) of the Securities<br>        Exchange Act of 1934<br>(3)  Violation of § 20(a) of the Securities<br>        Exchange Act of 1934<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, Scott Wilson ("Plaintiff"), by and through his attorneys, alleges upon information

and belief, except for those allegations that pertain to him, which are alleged upon personal

knowledge, as follows:

## <u>SUMMARY OF THE ACTION</u>

1.      Plaintiff brings this stockholder action against Zynerba Pharmaceuticals, Inc.

("Zynerba" or the "Company") and the Company's Board of Directors (the "Board" or the

"Individual Defendants," collectively with the Company, the "Defendants"), for violations of

Sections 14(e), 14(d), and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act")

as a result of Defendants' efforts to sell the Company to Harmony Biosciences Holdings, Inc., ("Parent"), through a wholly owned subsidiary, Xylophone Acquisition Corp. ("Purchaser" collectively with Parent, "Harmony") as a result of an unfair process, and to enjoin an upcoming tender offer on a proposed all cash transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in an August 14, 2023 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, in exchange for each share of Zynerba common stock owned, Zynerba shareholders will receive $1.1059 per share, plus one contingent value right per share (each, a "CVR").  For each CVR, the shareholder has the right to receive payments for an aggregate of up to $2.5444 per CVR upon the achievement of certain specified milestones in accordance with the Contingent Value Rights Agreement.  As a result of the consummation of the Proposed Transaction, Zynerba will become an indirect wholly-owned subsidiary of Parent.

3.      Thereafter, on August 28, 2023, Zynerba filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair for a number of reasons.  For instance, the Proposed Transaction indicates that the vast majority of the merger consideration is in the form of a non-guaranteed CVR.

5.      Furthermore, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to Plaintiff as a public stockholder.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board

Members and executive officers will be able to exchange some Company options and restricted stock awards for the merger consideration.

6.     In violation of the Exchange Act, Defendants caused to be filed the materially deficient Recommendation Statement with the SEC in an effort to solicit stockholders, including Plaintiff, to tender their Zynerba shares in favor of the Proposed Transaction.   The Recommendation Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to tender in favor of the Proposed Transaction, and is thus in violation of the Exchange Act.   As detailed below, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Zynerba, provided by Zynerba to the Company's financial advisor MTS Health Partners, L.P. ("MTS"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by MTS and provided to the Company and the Board.   Accordingly, this action seeks to enjoin the Proposed Transaction.

7.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.   This action seeks to enjoin the Proposed Transaction.

<u>**PARTIES**</u>

8.     Plaintiff is a citizen of Georgia and is a Zynerba stockholder.

9.     Defendant Zynerba operates as a clinical stage specialty pharmaceutical company. The Company focuses on developing pharmaceutically produced transdermal cannabinoid therapies for rare and near-rare neuropsychiatric disorders.   Zynerba is incorporated under the laws of the State of Delaware and has its principal place of business at 80 W. Lancaster Avenue, Suite

300, Devon, PA 19333.   Shares of Zynerba common stock are traded on the Nasdaq Stock Exchange under the symbol "ZYNE".

10.    Defendant Armando Anido ("Anido") has been a Director of the Company at all relevant times.   In addition, Anido serves as the Board Chairman and Chief Executive Officer ("CEO") of the Company.

11.    Defendant Warren D. Cooper ("Cooper") has been a Director of the Company at all relevant times.

12.    Defendant John P. Butler ("Butler") has been a director of the Company at all relevant times.

13.    Defendant William J. Federici ("Federici") has been a director of the Company at all relevant times.

14.    Defendant Daniel L. Kisner ("Kisner") has been a director of the Company at all relevant times.

15.    Defendant Kenneth I. Moch ("Moch") has been a director of the Company at all relevant times.

16.    Defendant Pamela Stephenson ("Stephenson") has been a director of the Company at all relevant times.

17.    Defendants identified in ¶¶ 10 - 16 are collectively referred to as the "Individual Defendants."

18.    Non-Party Parent, a commercial-stage pharmaceutical company, focuses on developing and commercializing therapies for patients with rare and other neurological diseases in the United States.  Parent is a Delaware Corporation headquartered at 630 W. Germantown Pike,

Suite 215, Plymouth Meeting, PA 19462.  Shares of Parent's stock trades on the Nasdaq Stock Exchange ("Nasdaq") under the ticker symbol "HRMY."

19.     Non-Party Merger Sub is an affiliate of Parent created to effectuate the proposed transaction.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(d), 14(e), and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

21.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its principal offices within the District.

## SUBSTANTIVE ALLEGATIONS

*Company Background*

23.    Zynerba operates as a clinical stage specialty pharmaceutical company. The company focuses on developing pharmaceutically produced transdermal cannabinoid therapies for rare and near-rare neuropsychiatric disorders.

24.    The Company is developing Zygel, the first and only pharmaceutically-manufactured cannabidiol formulated as a patent-protected permeation-enhanced clear gel, designed to provide consistent drug delivery into the bloodstream transdermally (i.e. through the skin). Recent studies suggest that cannabidiol may modulate the endocannabinoid system and improve certain behavioral symptoms associated with neuropsychiatric conditions. Zygel is an investigational drug product in development for the potential treatment of behavioral symptoms associated with Fragile X syndrome (FXS) and 22q11.2 deletion syndrome (22q).

25.    The Company's recent financial and clinical performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated sustained and solid performance.  For example, in the May 15, 2023 press release announcing its 2023 Q1 Financials, the Company noted that as of March 31, 2023, cash and cash equivalents were $44.4 million and the Company had a cash runway to mid-year 2024.

26.    Speaking on these positive results, Board Chairman, CEO, and Defendant Anido stated as follows: "The first quarter of 2023 was a period of continued focus and execution on our two lead programs with Zygel."

27.    Defendant Anido continued, noting bright future prospects for Zynerba: "During the quarter we continued to enroll patients in our confirmatory pivotal Phase 3 RECONNECT trial as we are committed to bringing the first pharmaceutical product indicated for the treatment of

behavioral symptoms of Fragile X syndrome to market. In addition, we expect continued dialogue with the U.S. Food and Drug Administration (FDA) in 2023 regarding an acceptable trial design for our Phase 3 program in patients with 22q deletion syndrome, with the goal of finalizing a trial design by the end of 2023."

28.     These positive clinical results are not an anomaly, but rather, are indicative of a trend of continued financial success by Zynerba.  Clearly, based upon these positive results and outlook, the Company is likely to have tremendous future success.

29.     Despite this upward trajectory and solid financial results, the Individual Defendants have caused Zynerba to enter into the Proposed Transaction without providing requisite information to Zynerba stockholders such as Plaintiff.

***The Flawed Sales Process***

30.     As detailed in the Recommendation Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible.  Moreover, the Recommendation is materially deficient in the information it fails to provide.

31.     The Recommendation Statement describes that each CVR represents a non-tradable contractual right to receive contingent payments in an aggregate amount of up to $2.5444 per CVR but does not disclose sufficient information as to why the majority of the merger consideration is not guaranteed.

32.     The Recommendation Statement fails to adequately disclose whether a committee of independent and disinterested board members was created to run the sales process and, if so,

whether that committee was empowered to veto a potential transaction not in the best interest of common shareholders.

33.    In addition, the Recommendation Statement is silent as to the nature of the confidentiality agreements entered into between the Company and potentially interested third parties, including Harmony, throughout the sales process, if any, and whether these agreements differ from each other, and if so in what way.

34.    The Recommendation Statement also fails to disclose all specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and any potentially interested third parties, throughout the sales process, if any, would fall away.

35.    It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

***The Proposed Transaction***

36.    On August 14, 2023, Zynerba and Harmony issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> PLYMOUTH MEETING, Pa, and DEVON, Pa, August 14, 2023 — Harmony Biosciences Holdings, Inc. ("Harmony") (Nasdaq: HRMY), a pharmaceutical company dedicated to developing and commercializing innovative therapies for patients with rare neurological diseases, today announced a definitive agreement to acquire Zynerba Pharmaceuticals, Inc. ("Zynerba") (Nasdaq: ZYNE), a leader in innovative pharmaceutically-produced transdermal cannabinoid therapies for orphan neuropsychiatric disorders, including Fragile X syndrome (FXS).
>
> Under the terms of the definitive agreement, Harmony will commence a tender offer to acquire all outstanding shares of Zynerba for a purchase price of $1.1059 per share in cash, or $60 million in the aggregate, plus one non-tradeable contingent value right (CVR) per share, representing the right to receive potential additional payments of up to $140 million in the aggregate, subject to the achievement of certain clinical, regulatory and sales milestones, as described in more detail below.

"This is an important step in Harmony's strategy to build a diversified portfolio of innovative assets to address unmet medical needs and drive our long-term growth. This acquisition affords us the opportunity to advance the development and delivery of a potentially transformative treatment for the symptoms of Fragile X syndrome and other rare neuropsychiatric disorders," said Jeffrey M. Dayno, M.D., President and Chief Executive Officer at Harmony Biosciences. "In addition to the strength of our core business in narcolepsy and our current life cycle management programs with pitolisant, led by idiopathic hypersomnia, we are excited to continue to diversify our portfolio beyond sleep/wake by adding Zynerba's clinical development programs to our pipeline. The team at Zynerba has been dedicated to these programs and we are confident that our combined efforts could have a profound impact on individuals living with rare neuropsychiatric disorders and their families."

"Harmony's development and commercial expertise, technologies, people and focus on rare neurological diseases are an excellent strategic fit with Zynerba," said Armando Anido, Chairman and Chief Executive Officer of Zynerba. "I am very proud of Zynerba's accomplishments with Zygel™ to date. With Harmony's scale, resources and proven commercial excellence, they are well positioned to potentially bring to market the first pharmaceutical product indicated for the treatment of behavioral symptoms of Fragile X syndrome and to maximize the value of Zygel."

Zynerba's lead asset, Zygel, is the first and only pharmaceutically manufactured, synthetic cannabidiol, a non-euphoric cannabinoid, formulated as a patent-protected permeation-enhanced gel for transdermal delivery through the skin and into the circulatory system. Zygel is manufactured through a synthetic process in a cGMP facility and is not extracted from the cannabis plant. Therefore, it is devoid of THC, which is what causes the euphoric effect of cannabis, and has the potential to be a nonscheduled product if approved. Zygel is currently being evaluated in a pivotal Phase 3 clinical trial for patients living with FXS, known as the RECONNECT Trial. Additionally, Zygel showed positive signals in an open label Phase 2 trial in patients living with 22q11.2 deletion syndrome (22q), called the INSPIRE Trial.

Cannabidiol, the active ingredient in Zygel, has been granted orphan drug designation by the U.S. Food and Drug Administration (FDA) and the European Medicines Agency (EMA) for the treatment of FXS and for the treatment of 22q. Additionally, Zygel has received FDA Fast Track designation for the treatment of behavioral symptoms in patients with FXS.

FXS is a rare genetic disorder that affects approximately 80,000 people in the U.S., causing intellectual disabilities and behavioral challenges. Despite considerable progress in medical science, there remains a significant unmet medical need in treating patients living with this debilitating disorder. There are currently no FDA approved therapies to treat FXS.

It is estimated that there are approximately 80,000 people living with 22q in the U.S. Patients with 22q are affected by symptoms related to many organ systems including neuropsychiatric symptoms such as anxiety and behavioral difficulties. There are currently no FDA-approved therapies to treat 22q.

**Transaction Details**

Under the terms of the definitive agreement, which was unanimously approved by the boards of directors of Harmony and Zynerba, Harmony will commence a tender offer to acquire all outstanding shares of Zynerba for a purchase price of $1.1059 in cash per share, or $60 million in the aggregate payable at closing of the transaction plus one non-tradeable CVR representing the right to receive potential additional payments of up to $140 million or approximately $2.5444 in additional cash per share, for a total potential consideration of up to $200 million in cash. The CVR is payable subject to certain terms and conditions upon achievement of the following milestones:

*Clinical Milestones*

- Completion of FXS Phase 3 clinical trial: $15 million in the aggregate or approximately $0.2747 per share
- Positive data readout from FXS Phase 3 clinical trial:
    $30 million in the aggregate or approximately $ 0.5494 per share if completed on or before December 31, 2024
    $20 million in the aggregate or approximately $ 0.3663 per share if completed on or before June 30, 2025
    $10 million in the aggregate or approximately $ 0.1831 per share if completed after June 30, 2025

*Regulatory Milestones*
- FDA approval in FXS: $35 million in the aggregate or approximately $0.6389 per share
- FDA approval in Second Indication: $15 million in the aggregate or approximately $0.2707 per share

*Net Sales Milestones*
- Achievement of $250 million in aggregate Net Sales: $15 million in the aggregate or approximately $0.2702 per share
- Achievement of $500 million in aggregate Net Sales: $30 million in the aggregate or approximately $0.5405 per share

Each CVR is subject to the achievement of the milestone conditions described above, and there can be no assurance whether any such milestones will be achieved or when any payments will be made with respect to any CVR.

Harmony will fund the transaction from its existing cash on hand. As of June 30, 2023, Harmony had cash, cash equivalents and investment securities of $429.6 million. Zynerba's existing cash and cash equivalent balance was approximately $36.0 million as of June 30, 2023.

The transaction is expected to close by the fourth quarter of 2023, subject to customary closing conditions, including that the holders of at least a majority of the outstanding shares of Zynerba's common stock tender such shares to Harmony in connection with the tender offer. Following the successful closing of the tender offer, Harmony will acquire any shares of Zynerba it does not already own through a second-step merger at the same per share offer price as paid in the tender offer. Zynerba's board of directors unanimously recommends that Zynerba's stockholders tender their shares in the tender offer.

### *Potential Conflicts of Interest*

37.     The breakdown of the benefits of the deal indicates that Zynerba insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Zynerba.

38.     Company insiders, currently own large, illiquid portions of Company stock all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company as follows:

| | Number of Shares Owned (#) | Closing Amount ($) | Maximum Value of CVRs in Respect of Shares ($) | Maximum Total Value with respect to Shares ($) |
|---|---|---|---|---|
| **Executive Officers:** | | | | |
| Armando Anido[(1)] | 1,234,444 | 1,365,171.62 | 3,140,919.31 | 4,506,090.93 |
| James E. Fickenscher | 557,085 | 616,080.30 | 1,417,447.07 | 2,033,527.37 |
| Terri B. Sebree | 778,642 | 861,100.19 | 1,981,176.70 | 2,842,276.89 |
| Albert P. Parker | 312,018 | 345,060.71 | 793,898.60 | 1,138,959.31 |

| | | | | |
|---|---|---|---|---|
| Brian Rosenberger | 375,970 | 415,785.22 | 956,618.07 | 1,372,403.29 |
| Kenneth Jones | 119,711 | 132,388.40 | 304,592.67 | 436,981.07 |
| | | | | |
| **Directors:** | | | | |
| John P. Butler | 80,765 | 89,318.01 | 205,498.47 | 294,816.48 |
| Warren D. Cooper, MB, BS, BSc, MFPM | 75,778 | 83,802.89 | 192,809.54 | 276,612.43 |
| William J. Federici | 75,778 | 83,802.89 | 192,809.54 | 276,612.43 |
| Daniel L. Kisner, MD | 75,778 | 83,802.89 | 192,809.54 | 276,612.43 |
| Kenneth I. Moch | 75,778 | 83,802.89 | 192,809.54 | 276,612.43 |
| Pamela Stephenson | 75,778 | 83,802.89 | 192,809.54 | 276,612.43 |
| l of the current executive officers and directors as a group (12 persons) | 3,837,525 | 4,243,918.90 | 9,764,198.59 | 14,008,117.49 |

(1)    Armando Anido is also a director of Zynerba.

40.    In addition, Company insiders, currently own large, illiquid portions of stock options, restricted share, or other equity award, which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction as follows:

| | Number of In-the-Money Company Options (#) | Number of Out-of-the-Money Company Options (#) | Cash Consideration and Maximum Cash Payments for CVRs in Respect of Shares ($)[1] |
|---|---|---|---|
| **Executive Officers:** | | | |
| Armando Anido[2] | — | 190,000 | 235,657 |
| James E. Fickenscher | — | 125,000 | 155,038 |
| Terri B. Sebree | — | 125,000 | 155,038 |
| Albert P. Parker | — | 200,000 | 190,060 |
| Brian Rosenberger | — | 90,000 | 111,627 |
| Kenneth Jones | — | 21,250 | 26,356 |

| | Number of In-the-Money Company Options (#) | Number of Out-of-the-Money Company Options (#) | Cash Consideration and Maximum Cash Payments for CVRs in Respect of Shares ($)[1] |
|---|---|---|---|
| **Directors:** | | | |
| John P. Butler | 106,399 | — | 328,264 |
| Warren D. Cooper, MB, BS, BSc, MFPM | 106,399 | — | 328,264 |
| William J. Federici | 106,399 | — | 328,264 |
| Daniel L. Kisner, MD | 106,399 | — | 328,264 |
| Kenneth I. Moch | 106,399 | — | 328,264 |
| Pamela Stephenson | 106,399 | — | 328,264 |

41.     In addition, certain employment agreements with certain Zynerba executives entitle such executives to significant amounts of money conditioned upon the consummation of the merger and/or their termination.  These 'golden parachute' packages are significant and will grant each director or officer entitled to them significant sums of money, compensation not shared by Plaintiff, as follows:

| Name | Cash ($)[1] | Equity Awards ($)[2] | Perquisites/ Benefits ($)[3] | Total ($) |
|---|---|---|---|---|
| Armando Anido | 1,719,861 | 2,698,686 | 122,616 | 4,541,163 |
| James E. Fickenscher | 893,698 | 1,820,305 | 68,902 | 2,782,905 |
| Terri B. Sebree | 1,061,940 | 1,870,679 | 33,465 | 2,966,084 |

42.     The Recommendation Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board,

as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

43.    Thus, while the Proposed Transaction is not in the best interests of Zynerba, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

**The Materially Misleading and/or Incomplete Recommendation Statement**

44.    On August 28, 2023, the Zynerba Board caused to be filed with the SEC a materially misleading and incomplete Recommendation Statement, that in violation the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

45.    Specifically, the Recommendation Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Recommendation Statement fails to disclose:

a.    Sufficient information as to why the majority of the merger consideration is not guaranteed;

a.    Adequate disclosure regarding whether a committee of disinterested and independent board members was formed, including the extent of powers of such a committee, if any, in evaluating the Proposed Transaction and whether that committee was empowered to veto a potential transaction not in the best interest of common shareholders;

b.  Whether the terms of any confidentiality agreements entered during the sales process between Zynerba on the one hand, and any other third party (including Harmony), if any, on the other hand, differed from one another, and if so, in what way;

c.  All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, if any, would fall away; and

d.  The Recommendation Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

*Omissions and/or Material Misrepresentations Concerning Zynerba Financial Projections*

46.     The Recommendation Statement fails to provide material information concerning financial projections for Zynerba provided by Zynerba management and relied upon by MTS in its analyses.

47.     Notably, in its fairness opinion, MTS indicates that it reviewed, "certain internal financial analyses and forecasts prepared by and provided to it by the management of Zynerba relating to its business."

48.     The Recommendation Statement, therefore, should have, but fails to provide, certain information in the projections that Zynerba management provided to the Board and MTS. Courts have uniformly stated that "projections … are probably among the most highly-prized

disclosures by investors.  Investors can come up with their own estimates of discount rates or []
market multiples.  What they cannot hope to do is replicate management's inside view of the
company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del.
Ch. 2007).

49.     With regard to the *Q1 Results (Comparable Pricing) Forecast* prepared by Zynerba
management and provided to MTS, the Recommendation Statement fails to disclose material line
items for important metrics as follows:

> a.   Unlevered Free Cash Flow, including all underlying inputs, metrics, and
> assumptions, including specifically: interest income, income taxes,
> depreciation, net change in accounts payable and accrued expenses, net change
> in Australian tax credits and goods and services taxes, working capital charge,
> and capital investments.

50.     With regard to the *Q1 Results (Mid-Pricing) Forecast* prepared by Zynerba
management and provided to MTS, the Recommendation Statement fails to disclose material line
items for important metrics as follows:

> a.   Unlevered Free Cash Flow, including all underlying inputs, metrics, and
> assumptions, including specifically: interest income, income taxes,
> depreciation, net change in accounts payable and accrued expenses, net change
> in Australian tax credits and goods and services taxes, working capital charge,
> and capital investments.

51.     With regard to the *Q1 Results (Rare Disease Pricing) Forecast* prepared by
Zynerba management and provided to MTS, the Recommendation Statement fails to disclose
material line items for important metrics as follows:

a. Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

52.    With regard to the *Adjusted Q1 Results (Comparable Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

a. Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

53.    With regard to the *Adjusted Q1 Results (Mid-Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

a. Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

54.     With regard to the *Adjusted Q1 Results (Rare Disease Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

    a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

55.     With regard to the *Q2 Results (Comparable Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

    a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

56.     With regard to the *Q2 Results (Mid-Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

    a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change

in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

57.     With regard to the *Q2 Results (Rare Disease Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

a.     Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

58.     With regard to the *Adjusted Q2 Results (Comparable Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

a.     Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

59.     With regard to the *Adjusted Q2 Results (Mid-Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

a.     Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes,

depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

60.     With regard to the *Adjusted Q2 Results (Rare Disease Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

     a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

61.     With regard to the *Q3 Results (Comparable Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

     a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

62.     With regard to the *Q3 Results (Mid-Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

     a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

63.    With regard to the *Q3 Results (Rare Disease Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

     a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

64.    With regard to the *Adjusted Q3 Results (Comparable Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

     a.  Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

65.     With regard to the *Adjusted Q3 Results (Mid-Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

      a.   Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

66.     With regard to the *Adjusted Q3 Results (Rare Disease Pricing) Forecast* prepared by Zynerba management and provided to MTS, the Recommendation Statement fails to disclose material line items for important metrics as follows:

      a.   Unlevered Free Cash Flow, including all underlying inputs, metrics, and assumptions, including specifically: interest income, income taxes, depreciation, net change in accounts payable and accrued expenses, net change in Australian tax credits and goods and services taxes, working capital charge, and capital investments.

67.     The Recommendation Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in all sets of provided projections.

68.     The Recommendation Statement also fails to provide all adjustments and assumptions made underlying the different cases of each set of projections.

69.     This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this

information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

70.     Without accurate projection data presented in the Recommendation Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of MTS's financial analyses, or make an informed decision whether to tender his shares in favor of the Proposed Transaction.  As such, the Board is in violation of the Exchange Act by failing to include such information in the Recommendation Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by MTS*

71.     In the Recommendation Statement, MTS describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

72.     With respect to the *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following:

> a.   The specific metrics, inputs, and assumptions used to determine the utilized discount rate of 18%;
>
> b.   The weighted average cost of capital for the Company utilized;
>
> c.   The weighted average cost of capital calculated for the publicly traded comparable companies utilized;
>
> d.   The tax savings from usage of federal net operating losses and future losses utilized;

    e.  The specific metrics, inputs, and assumptions used to determine the utilized sensitivity rate range of the Company's weighted average cost of capital of 17% to 19% utilized; and

    f.  The specific metrics, inputs, and assumptions used to determine the utilized sensitivity rate range of the revenue achievement rates of 85% to 115% utilized.

73.    With respect to the *Public Trading Comparable Companies Analysis*, the Recommendation Statement fails to disclose the following:

    a.  For Set 1, the specific metrics, inputs, and assumptions used to determine the implied Price per Share, including specifically: implied market capitalization of Zynerba, Zynerba management's estimated unadjusted peak sales and revenues, the range of market capitalization to unadjusted peak sales multiples for Zynerba, and the number of fully diluted shares outstanding of Zynerba utilized; and

    b.  For Set 2, the specific metrics, inputs, and assumptions used to determine the implied per share prices, including specifically: Zynerba's net debt, the number of fully diluted shares of Zynerba outstanding, and the average of unadjusted peak revenues utilized.

74.    With respect to the *Precedent Transactions Analysis*, the Recommendation Statement fails to disclose the following:

    a.  The closing date for each of the selected transactions;

    b.  For the enterprise value to unadjusted peak sales multiples based on the first and third quartiles of the comparable companies data set:

        i.   The specific metrics, inputs, and assumptions used to determine the implied enterprise value of Zynerba;

       ii.   The range of multiples applied;

      iii.   The net debt of Zynerba utilized; and

      iv.   The number of fully diluted shares outstanding of Zynerba utilized.

c.   For the enterprise value to unadjusted peak sales multiples based on the first and third quartiles of the comparable companies data set excluding transactions with program failures:

       i.   The specific metrics, inputs, and assumptions used to determine the implied enterprise value of Zynerba;

       ii.   The range of multiples applied;

      iii.   The net debt of Zynerba utilized; and

      iv.   The number of fully diluted shares outstanding of Zynerba utilized.

75.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to tender his shares in favor of the Proposed Transaction.

76.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder.  As such, the Board has violated the Exchange Act by failing to include such information in the Recommendation Statement.

**FIRST COUNT**

**Violations of Section 14(e) of the Exchange Act**

**(Against All Defendants)**

77.   Plaintiff repeats all previous allegations as if set forth in full herein.

78.   Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders, including Plaintiff, to tender their shares in favor of the Proposed Transaction.

79.   Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

80.   The Recommendation Statement was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

81.   The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

82.   The Individual Defendants were at least negligent in filing a Recommendation Statement that was materially misleading and/or omitted material facts necessary to make the Recommendation Statement not misleading.

83.   The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to tender

its shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

84.     Plaintiff has no adequate remedy at law.

## SECOND COUNT

### Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9

### (Against all Defendants)

85.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

86.     Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders, including Plaintiff, to tender their shares in favor of the Proposed Transaction.

87.     Section 14(d)(4) requires Defendants to make full and complete disclosure in connection with a tender offer.

88.     SEC Rule 14d-9 requires a Company's directors to, furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

89.     Here, the Recommendation Statement violates both Section 14(d)(4) and SEC Rule 14d-9 because it because it is materially misleading in numerous respects, omits material facts, including those set forth above and Defendants knowingly or recklessly omitted the material facts from the Recommendation Statement.

90.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to tender his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

91.     Plaintiff has no adequate remedy at law.

### THIRD COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

92.     Plaintiff repeats all previous allegations as if set forth in full herein.

93.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Recommendation Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

94.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Recommendation Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Recommendation Statement.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Recommendation Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

95.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Zynerba's business, the information contained in its filings with the SEC, and its

public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Recommendation Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Recommendation Statement and are therefore responsible and liable for the misrepresentations contained herein.

96.    The Individual Defendants acted as controlling persons of Zynerba within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Zynerba to engage in the wrongful conduct complained of herein.   The Individual Defendants controlled Zynerba and all of its employees.  As alleged above, Zynerba is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A.    Enjoining the Proposed Transaction;

B.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.    Directing the Individual Defendants to comply with the Exchange Act and to disseminate a Recommendation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.


Dated: September 8, 2023                           **BRODSKY & SMITH**


                                          By:  *s/ Marc L. Ackerman*
                                               Evan J. Smith
                                               Marc L. Ackerman (56294)
                                               Two Bala Plaza, Suite 805
                                               Bala Cynwyd, PA 19004
                                               Telephone:    610-667-6200
                                               Facsimile:    610-667-9029


                                               *Counsel for Plaintiff*